1

2

3

4

5

6

7                       UNITED STATES DISTRICT COURT

8                       EASTERN DISTRICT OF CALIFORNIA

9                             ----oo0oo----

10   SONYA WOLF, individually and
     as Guardian Ad Litem for her
11   minor son NICHOLAS H.,
                                          NO. CIV. S-06-0047 WBS KJM
12               Plaintiffs,

13       v.                               MEMORANDUM AND ORDER RE:
                                          MOTION TO DISMISS
14
     COUNTY OF SAN JOAQUIN, MELISSA
15   TORRES, individually and as an
     employee of the County of San
16   Joaquin, MICHELLE MCDANIEL,
     individually and as an
17   employee of the County of San
     Joaquin, JENNIFER INDULA,
18   individually and as an
     employee of the County of San
19   Joaquin, SAN JOAQUIN COUNTY
     SHERRIF'S OFFICE, VALERIE
20   AGBULOS, individually and as
     an employee of the County of
21   San Joaquin, and Does 1
     through 50, inclusive,
22
                 Defendants.
23

24                            ----oo0oo----

25           Plaintiffs Sonya Wolf and Nicholas H. allege several

26   causes of action against defendants, including violation of

27   plaintiffs' constitutional rights, actionable under 42 U.S.C. §

28   1983 and California Civil Code § 52.1, and intentional infliction

                                   1

1 of emotional distress.[1]  (Compl.)  Pursuant to Federal Rule of

2 Civil Procedure 12(b)(6), defendants County of San Joaquin,

3 Melissa Torres, Michelle McDaniel,[2] and Valerie Agbulos now move

4 for dismissal of these federal and state claims against them.[3]

5 I.   Factual and Procedural Background

6         On February 17, 2005, a school employee observed Wolf's

7 15-year-old daughter Brittany W. exchanging marijuana with

8 another individual.  (Compl. ¶¶ 24, 39.)  Brittany was taken to

9 the principal's office, where a search of her backpack revealed a

10 suspected weapon made of stolen school property.  (Id. ¶ 39.)

11 The school immediately suspended her and contacted her mother.

12 (Id.)

13         While waiting for Wolf to arrive, Brittany disclosed to

14 a teacher that Wolf's ex-boyfriend had inappropriately touched

15 her.  (Id. ¶ 43.)  The school did not share this information with

16 Wolf but did notify the Human Services Agency of San Joaquin

17 County ("the Agency") of Brittany's allegations on February 18,

18 2005.  (Id. ¶ 46.)  The Agency initially classified Brittany's

19 case as a "ten day response," "meaning that the facts reported

20 ────────────

21    [1]    The complaint's caption also lists "False
   Arrest/Imprisonment" as a basis for plaintiffs' suit; however,
22 plaintiffs do not include this claim in the body of the
   complaint.
23
   [2]    Both sides, including this party's own attorneys, refer
24 to her alternatively as both "McDaniel" and "McDaniels"
   throughout their papers.  It is not for the court to discern the
25 true spelling of her name, so the court will do the same.

26    [3]    Counsel for the moving defendants does not purport to
   represent the San Joaquin County Sheriff's Department or Jennifer
27 Indula.  Nevertheless, at oral argument, plaintiff asked to
   dismiss defendant Indula and accordingly, this order memorializes
28 that request below.

1 did not present an immediate emergency situation."  (Id. ¶ 47);

2 Rogers v. County of San Joaquin Human Servs. Agency, 363 F. Supp.

3 2d 1227, 1230 (E.D. Cal. 2004) (quotation omitted).  However, by

4 the time the Agency assigned the case to defendant Torres on

5 February 22, 2005, the status had changed to "immediate

6 response."  (Compl. ¶ 47.)

7         Torres, a case worker for the agency, tried to meet

8 with Wolf on the 22nd.  (Id. ¶ 54.)  After making initial contact

9 with Wolf by phone, however, Torres was unresponsive to Wolf's

10 efforts to meet and ascertain why the Agency needed to speak with

11 her.  (Id. ¶¶ 55-56.)  Eventually, Wolf contacted Indula, Torres'

12 supervisor, and scheduled an appointment for March 1, 2005 at

13 12:30 p.m.  (Id. ¶ 56.)

14         During the course of Torres' interview on the scheduled

15 date, mother and daughter told differing stories about conditions

16 in the home and Brittany's involvement with older men.  Brittany

17 again alleged that Wolf's ex-boyfriend had molested her, although

18 the complaint does not describe when this abuse supposedly

19 occurred.  Wolf explained that she had secured a restraining

20 order against the ex-boyfriend in October, 2003, and that she had

21 repeatedly called the sheriff to enforce the order when the ex-

22 boyfriend showed up at her house.  (Id. ¶ 84.)  She claimed that

23 the ex-boyfriend had last been at the house in July or August,

24 2004.[4]  (Id. ¶ 92.)  Brittany told Torres that his last

25 appearance was on February 24, 2005.  (Id. ¶ 82.)

26 —————————————

27     [4]   According to the sheriff's records, Wolf's most recent
call regarding a violation of the restraining order was made on
28 September 14, 2004.  (Compl. ¶ 93.)

3

1          Meanwhile, Wolf suggested to Torres that Brittany may
2  have made up the story about the ex-boyfriend in retaliation for
3  his having reported to Wolf at the end of 2004 that something was
4  going on between Brittany and an adult neighbor named Ralph.
5  (Id. ¶ 63.)  Wolf was suspicious of Ralph for some time, but did
6  not know the extent of his relationship with Brittany until
7  February 19, 2005, when Brittany confessed to her mother that she
8  had been exchanging oral sex with Ralph for marijuana.  (Id. ¶
9  38.)  By that time, however, Ralph had moved away.  (Id. ¶¶ 33,
10 38.)

11         Wolf further alleges that Brittany was reluctant to
12 turn in Ralph and that Wolf did not immediately report the abuse
13 because she wanted to give Brittany a chance to report it
14 herself.  (Id. ¶ 34.)  But when given the opportunity to tell
15 Torres about Ralph, Brittany adamantly denied any involvement
16 with the man.  (Id. ¶ 90.)

17         Brittany's story changed dramatically when she realized
18 that Torres and Agbulos, a sheriff's deputy called by Torres for
19 assistance, intended to remove her from her mother's home.
20 (Id. ¶ 104, 110.)  She recanted her allegations against the ex-
21 boyfriend and admitted that she had a relationship with the
22 neighbor Ralph.  (Id. ¶ 104, 110.)  But despite the fact that
23 Brittany and Wolf's stories were more or less the same at this
24 point, Torres and Agbulos continued to insist that Wolf "admit"
25 that her ex-boyfriend had recently been by the house.  (Id. ¶
26 109.)  Wolf, "having been now brow beat for several hours, and
27 fearing there was no other means by which to keep her children
28 from being removed . . . shouted, 'O.k., fine, he was here.'"

1  (Id. ¶ 114.)

2          "Agbulos and Torres then both shook their heads and
3  said we have to take the kids, we can't leave them here, 'It's
4  just not safe.'" (Id. ¶ 115.)  Wolf suggested alternatives to
5  removing the children from her custody and offered to take them
6  to her father's house in Palo Alto.  (Id. ¶ 117.)  But Agbulos
7  and Torres had already decided to forcibly take custody of
8  Brittany and Nicholas.  (Id. ¶ 118.)  Accordingly, the children
9  were loaded into separate cars and transported to a local shelter
10 facility.  (Id. ¶ 120-21.)  The ultimate reason for removing the
11 children appears to have been "the disclosure of sexual molest
12 [sic] and the mother's failure to protect her daughter . . . ."
13 (Id. ¶ 129.)  "[A]llegations of general neglect were found to be
14 inconclusive . . . ."  (Id.)

15         Defendant McDaniels assumed responsibility for the
16 subsequent juvenile detention proceedings.  (Id. ¶ 131.)  On
17 March 3, 2005 she filed a Detention Report and Juvenile
18 Dependency Petition, which was prepared based on Torres' now
19 unavailable case notes.  (Id. ¶ 130.)  Wolf alleges that these
20 documents included "completely false statements of fact, all of
21 which were either made with knowledge of their falsity, or
22 reckless disregard and deliberate indifference as to the truth or
23 falsity thereof . . . ."  (Id. ¶ 129.)  For example, although,
24 according to the complaint, Brittany at most claimed that the ex-
25 boyfriend had touched her inappropriately, McDaniels' report
26 stated that the two had sex.  (Id.)  Wolf further alleges that
27 McDaniels failed to perform any investigation of her own and
28 relied entirely on the information supplied by Torres, which

5

1   omitted several exculpatory facts.  (<u>Id.</u> ¶ 133.)

2           The County returned Nicholas to Wolf's care on or about

3   May 16, 2005, pursuant to a stipulated dismissal of his

4   dependency case.  (<u>Id.</u> ¶ 9.)  Brittany was also returned

5   following the denial of the Agency's dependency petition,

6   although the complaint does not state when she was released.

7   (<u>Id.</u>)  Plaintiffs Wolf and Nicholas subsequently filed this suit,

8   which alleges three causes of action based on 42 U.S.C. § 1983:

9   (1) violation of plaintiffs' Fourteenth Amendment rights to

10  familial association, (2) violation of plaintiff Nicholas' Fourth

11  Amendment right to be free of in-home warrantless seizure, and

12  (3) further violation of plaintiffs' Fourteenth Amendment rights

13  to familial association through continued, unjustified detention

14  of the children.  (<u>Id.</u> ¶¶ 139-46.)  Plaintiffs also raise state

15  law claims based on California Civil Code § 52.1 and Intentional

16  Infliction of Emotional Distress.  (<u>Id.</u> ¶¶ 147-52.)  They seek an

17  assortment of damages, including compensation for resulting

18  medical expenses and damage to reputation.  (<u>Id.</u> ¶¶ 136-37.)

19  They also seek exemplary/punitive damages pursuant to California

20  Civil Code § 3294.  By this motion and based on several sources

21  of immunity for government officials, defendants County of San

22  Joaquin, Torres, McDaniel, and Agbulos move to dismiss all

23  claims.

24  II.  <u>Discussion</u>

25       A.   <u>Legal Standard</u>

26           On a motion to dismiss, the court must accept the

27  allegations in the complaint as true and draw all reasonable

28  inferences in favor of the pleader.  <u>Scheuer v. Rhodes</u>, 416 U.S.

1  232, 236 (1974); <u>Cruz v. Beto</u>, 405 U.S. 319 (1972).  The court

2  may not dismiss for failure to state a claim unless "it appears

3  beyond doubt that plaintiff can prove no set of facts in support

4  of his claim which would entitle him to relief."  <u>Van Buskirk v.</u>

5  <u>CNN, Inc.</u>, 284 F.3d 977, 980 (9th Cir. 2002).  Dismissal is

6  appropriate, however, where the pleader fails to allege facts

7  that support a cognizable legal theory.  <u>Balistreri v. Pacifica</u>

8  <u>Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1988); <u>see also</u> <u>Conley</u>

9  <u>v. Gibson</u>, 355 U.S. 41, 47 (1957) (complaint must "give the

10 defendant fair notice of what the plaintiff's claim is and the

11 grounds upon which it rests").

12      B.    <u>Section 1983 Claims</u>

13         Defendants contend that they are entitled to qualified

14 and, in some instances, absolute immunity for the removal of the

15 children and their subsequent detention.  The Ninth Circuit has

16 held that social workers enjoy absolute immunity for

17 "discretionary, quasi-prosecutorial decisions to institute court

18 dependency proceedings to take custody away from parents."

19 <u>Miller v. Gammie</u>, 335 F.3d 889, 898 (9th Cir. 2003) (citing

20 <u>Meyers v. Contra Costa County Dep't of Soc. Servs.</u>, 812 F.2d

21 1154, 1157 (9th Cir. 1987)).  However, the scope of this immunity

22 is "extremely narrow."  <u>Id.</u>  Thus, while social workers may claim

23 absolute immunity for decisions to institute dependency

24 proceedings and for submissions made to a court, they are not

25 similarly protected when they take actions to detain juveniles

26 prior to any dependency proceedings.  <u>Doe v. Lebbos</u>, 348 F.3d

27 820, 825-26 (9th Cir. 2003); <u>Miller</u>, 335 F.3d at 898; <u>Cf.</u> <u>Broam</u>

28 <u>v. Bogan</u>, 320 F.3d 1023, 1028 (9th Cir. 2003) (holding that

7

1  prosecutorial immunity, on which social worker immunity is based,

2  does not extend to investigatory or administrative functions

3  separate from a prosecutor's role as judicial a advocate).

4        When absolute immunity is unavailable, government

5  officials still have the possibility of qualified immunity.  See

6  Mabe v. San Bernardino County Dep't of Pub. Soc. Servs., 237 F.3d

7  1101, 1106 (9th Cir. 2001) (commenting that "qualified immunity

8  is the general rule and absolute immunity the exceptional case").

9  The applicability of qualified immunity is determined through a

10 two-step inquiry where the court asks: "(1) whether, 'taken in

11 the light most favorable to the party asserting the injury, the

12 facts alleged show the officer's conduct violated a

13 constitutional right'; and, if a violation of a constitutional

14 right [can] indeed be found, (2) 'whether the right was clearly

15 established.'"  Sissoko v. Rocha, 412 F.3d 1021, 1038 (9th Cir.

16 2005) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).  In

17 other words, qualified immunity shields government officials from

18 liability for a violation of plaintiffs' rights if "the

19 official[s] objectively could have believed the conduct was

20 lawful."  Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1997)

21 (involving the qualified immunity of a social worker and a police

22 officer); see also Devereaux v. Perez, 218 F.3d 1045, 1059 (9th

23 Cir. 2000) (Kleinfeld, J., dissenting) ("The question, in a

24 qualified immunity legal analysis, boils down to 'Should they

25 have known better?'").

26        Plaintiffs describe three bases for their § 1983 claims

27 that defendants argue are barred by the immunity doctrines.

28 First, plaintiffs allege that defendants County, Torres, Agbulos

8

1  and Indula violated their Fourteenth Amendment rights to

2  "familial association with one another" when the minor children,

3  Brittany and Nicholas, were removed from their home "without

4  consent, probable cause, a protective custody warrant, or exigent

5  circumstances . . . ." (Compl. ¶ 139.)  Second, Nicholas

6  individually claims a violation of his Fourth Amendment right to

7  be free of unreasonable seizure, a violation he attributes to the

8  actions of the Agency, Torres, and Indula.  (Id. ¶ 141.)

9  Finally, plaintiffs claim that the continued detention of the

10 children, from March 1st until mid-May, 2005, further violated

11 their Fourteenth Amendment rights to familial association.  (Id.

12 ¶ 143.)  Defendants argue that they are entitled to qualified

13 immunity for all three claims and that they are additionally

14 entitled to absolute immunity with respect to claim three.

15              1.    Deprivations at the Time of Removal

16          Plaintiffs' first and second claims both target

17 defendants' actions on March 1, 2005, when, after over five hours

18 of investigation, Torres and Agbulos forcibly removed Brittany

19 and Nicholas from Wolf's home.  Such steps can violate the rights

20 of parents under the Fourteenth Amendment by interfering with

21 their substantive due process right to family association.[5]

22 Wallis v. Spencer, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000).  They

23 can likewise violate the Fourth Amendment rights of the children

24

25      [5]    Defendants do not address whether the Fourteenth
   Amendment right to family association can be claimed by a child
26 (as opposed to a parent) when his or her sibling is removed.
   Because they have failed to discuss this distinction, the court
27 assumes for the purposes of this motion that both Wolf and
   Nicholas can assert a violation of their Fourteenth Amendment
28 rights regarding Brittany's removal.

1 actually seized.  Id.  "Officials may remove a child from the

2 custody of its parent without prior judicial authorization only

3 if the information they possess at the time of the seizure is

4 such as provides reasonable cause to believe that the child is in

5 imminent danger of serious bodily injury . . . ."  Id. at 1138

6 (emphasis added).

7        Defendants discuss in detail the factual predicates

8 that established "reasonable cause to take the children into

9 custody . . . ."  (Defs.' Mem. of P. & A. 8.)  Noticeably absent

10 from their arguments, however, is any serious contention that

11 either Brittany or Nicholas was in imminent danger, such that

12 there was no time to secure a court order before taking them into

13 custody.[6]  See Mabe, 237 F.3d at 1108 (finding no justification

14 for the removal of a child believed to have been sexually abused

15 in the past when a warrant could be obtained within a few

16 hours); Rogers, 363 F. Supp. 2d at 1235 ("[A]n official must

17 consider not only the severity of the threat to the child but

18 also whether the harm is so imminent that no delay can be

19 countenanced.").

20        Indeed, it does not appear, given the facts alleged,

21 that exigent circumstances existed here.  The agency initially

22 classified Brittany's allegations of abuse as a "ten day

23 response" and waited four days to assign a caseworker to her

24 file.  Then, after a caseworker was assigned and the case was re-

25 labeled as an "immediate response", a week went by before Torres

26

27        [6]    Plaintiffs allege, and defendants do not dispute, that
Torres and Agbulos acted without a court order authorizing
28 removal.

10

1  conducted her in-home investigation.  See Rogers, 363 F. Supp. 2d

2  at 1236 (holding that abuse was not imminent, "particularly in

3  light of the delay that had already occurred after the

4  referral").  Finally, the perpetrators of the alleged sexual

5  abuse were not immediately present in the home or surrounding

6  area.  Wolf had a restraining order against the ex-boyfriend and

7  the neighbor had moved away several weeks prior to the social

8  worker's visit.

9          In light of the case law existing at the time, and

10 viewing the evidence in a light most favorable to plaintiffs, no

11 reasonable officer or social worker could have believed that

12 removal was justified based on the facts alleged.[7]  Government

13 actors need more than simple probable cause before they can

14 remove a child without a court order.  This rule has been clearly

15 established in this circuit for some time and is additionally

16

17      [7]    The circumstances discussed above largely address
   whether the warrantless removal of Brittany was reasonable in
   light of clearly established law.  The removal of her six-year-
18 old brother Nicholas, apparently simply because his teenage
   sister had alleged sexual abuse, was even more questionable.
19 Although California law provides for the removal of a child based
   on the abuse of his or her sibling, there must be "a substantial
20 risk that the child will [likewise] be abused or neglected . . .
   ."  Cal. Welf. & Inst. Code § 300(j).  In making this
21 determination, the court should consider the age and gender of
   each child and the nature of the abuse.  Id.  Accordingly, absent
22 any allegations that either of Brittany's alleged attackers had
   homosexual tenancies, Torres and Agbulos had no reason to suspect
23 that Nicholas was likewise in imminent danger.  Compare In re
   Rubisela, 85 Cal. App. 4th 177, 198-99 (2000) (abuse by
24 heterosexual male perpetrator justified removal of an abused
   girl's sister but not brothers), with In re Jason L., 222 Cal.
25 App. 3d 1206, 1217 (1990) (removal of brother justified when
   sister alleged abuse because investigation suggested that the
26 accused perpetrator was interested sexually in both males and
   females).  Significantly, neither party suggests that any portion
27 of the over five hour investigation focused on the imminent
   danger that Nicholas may have faced.  Based on the facts alleged,
28 his warrantless removal was even more obviously unjustified.

11

1  codified in California state law.  Cal. Welf. & Inst. Code § 305

2  (permitting peace officers to take a minor into temporary custody

3  without a warrant based on reasonable cause <u>and</u> if "the minor is

4  in immediate danger of physical or sexual abuse"); <u>Mabe</u>, 237 F.3d

5  at 1108 n.2 (noting that "a showing of probable cause does not

6  [likewise show that a child] was in imminent danger of serious

7  physical injury [or] justify a warrantless removal").  <u>Cf.</u> <u>Hatch</u>

8  <u>v. Dep't for Children, Youth & Their Families</u>, 274 F.3d 12, 21

9  (1st Cir. 2001) (rejecting the Ninth Circuit approach and holding

10  that a mere "objectively reasonable suspicion of abuse justifies

11  protective measures").  Because defendants' actions, as alleged,

12  were not reasonable in light of clearly established law, they are

13  consequently not entitled to qualified immunity regarding claims

14  one and two at this stage.

15              2.  <u>Post-Removal Deprivations</u>

16              In contrast, defendants Torres and McDaniels[8] are

17

---

18      [8]  Although the moving defendants do not limit their
arguments for qualified immunity to a given subset of the
19  movants, a municipality, like the County, cannot assert a defense
based on qualified immunity, even though the acting employee is
20  entitled to it.  <u>Owens v. City of Independence</u>, 445 U.S. 622,
650-52 (1980) (holding that individual officers' entitlement to
21  qualified immunity does not immunize municipalities from <u>Monell</u>
liability); <u>Gibson v. County of Washoe, Nev.</u>, 290 F.3d 1175, 1186
22  n.7 (9th Cir. 2002) (noting that "a municipality may be liable if
an individual officer is exonerated on the basis of the defense
23  of qualified immunity").  Likewise, the County cannot
derivatively claim absolute immunity.  Municipal liability is not
24  founded on a respondeat superior theory, whereby the County, as
an employer, is vicariously responsible for the acts of its
25  employees.  Rather, local governments face liability when a
constitutional violation results from a policy or custom
26  promulgated by the County itself.  Accordingly, the County avoids
liability by showing that no constitutional right was violated or
27  that, if such a right was indeed violated, the County's policy
was not the cause.  <u>See</u> <u>Atkins v. County of Alameda</u>, No.
28  C-03-3566, 2004 WL 941212, at *4 n.8  (N.D. Cal. Apr. 30, 2004)

1  entitled to absolute immunity for at least some of their behavior

2  described in claim three.  As noted, absolute immunity attaches

3  when social workers are engaged in activities "connected with the

4  initiation and pursuit of child dependency proceedings."  Meyers,

5  812 F.2d at 1157.  Consequently, defendants are immune from

6  liability for the portions of claim three that deal with the

7  detention of the children based on a court order issued on "the

8  presentation of false facts and the exclusion of exculpatory

9  facts and information . . . ."  (Compl. ¶ 144.)  Defendants'

10 submissions to a court in relation to a dependency proceeding

11 cannot serve as the source for § 1983 liability, even if the

12 presentation was based on an inadequate investigation of the

13 allegations or included false evidence.  Lebbos, 348 F.3d at 823

14 (citing Mabe for the proposition that "where there [are]

15 allegations that social workers did not conduct their

16 investigation properly and submitted false evidence during

17 juvenile court proceedings, . . . social workers [are] entitled

18 to absolute immunity because their actions were part of the

19 initiation and pursuit of dependency proceedings").

20         However, claim three also alleges violation of

21 plaintiffs' rights based on the detention of the children prior

22 to the initial detention hearing.  As defendants note, their

23 actions during this period could be covered by qualified

24 ─────────────

25 ("This rule keeps municipal liability under section 1983 largely
   symmetric.  Municipal entities cannot claim-or derive-immunity
   from individual employees, but they cannot be held liable under
26 'the doctrine of respondeat superior under [section] 1983 for the
   constitutional torts of their employees,' either.").  Defendants
27 have not made the appropriate arguments to secure dismissal of
   the County and consequently, the court does not here consider
28 whether claim three can be dismissed as to the County defendant.

13

1 immunity.  Id. at 823.  Unfortunately, their argument for

2 qualified immunity on these aspects of claim three relies

3 entirely on the arguments they make for qualified immunity with

4 respect to claims one and two (that their conduct was

5 reasonable).  Because the court has rejected qualified immunity

6 for claims one and two based on a determination that defendants

7 failed to show that, based on the allegations in the complaint,

8 the children were in imminent danger, it follows that it must

9 reject defendants' arguments for qualified immunity on claim

10 three.

11         C.   State Law Claims

12         Defendants also argue that they are immune from

13 plaintiffs' state law claims based on statutorily provided

14 immunity that is arguably broader than the federal immunity

15 doctrines discussed above.  Significantly, pursuant to state law,

16 "[a] public employee is not liable for injury caused by his

17 instituting or prosecuting any judicial or administrative

18 proceeding within the scope of his employment, even if he acts

19 maliciously and without probable cause."  Cal. Gov. Code § 821.6;

20 see also  Cal. Gov. Code § 820.2 (immunity for discretionary

21 acts).  This immunity also covers the investigatory stage of

22 judicial proceedings.  Amylou R. v. County of Riverside, 28 Cal.

23 App. 4th 1205, 1209-10 (1994); Jenkins v. County of Orange, 212

24 Cal. App. 3d 278, 283-84 (1989).  Additionally, by operation of §

25 815.2(b), the county enjoys derivative immunity.  Cal. Gov. Code

26 § 815.2(b) ("[A] public entity is not liable for an injury

27 resulting from an act or omission of an employee of the public

28 entity where the employee is immune from liability."); see also

14

1  Robinson v. Solano County, 278 F.3d 1007, 1016 (9th Cir. 2002)

2  ("California . . . has rejected the Monell rule and imposes

3  liability on counties under the doctrine of respondeat superior

4  for acts of county employees; it grants immunity to counties only

5  where the public employee would also be immune.").

6          However, "California Government Code § 820.21 provides

7  that immunity for social workers does not extend to conduct that

8  includes perjury, fabrication of evidence, failure to disclose

9  exculpatory evidence and obtaining testimony by duress, if

10  committed with malice."  Parkes v. County of San Diego, 345 F.

11  Supp. 2d 1071, 1082 (S.D. Cal. 2004).  "Malice" as defined in

12  this section as "conduct that is intended . . . to cause injury

13  to the plaintiff or despicable conduct that is carried on . . .

14  with a willful and conscious disregard of the rights or safety of

15  others."  Cal. Gov. Code § 820.21(b).  This provision was

16  designed to provide an "effective check upon the arbitrary power

17  or absolute immunity of social workers," who, at the time of the

18  bill's passage, enjoyed "a civil immunity which surpasse[d] the

19  civil immunity of anyone else in our nation . . . ."  Comm. Rep.,

20  A.B. 1355, Reg. Sess. (Cal. 1995) (noting that "even presidents,

21  legislators and prosecutors are accountable to the political

22  process and the consent of the governed").

23          Plaintiffs repeatedly allege that the social workers

24  involved with Brittany's and Nicholas' cases failed to disclose

25  what plaintiffs have cast as exculpatory evidence.  (See, e.g.,

26  compl. ¶ 127.)  They also suggest that admissions, notably Wolf's

27  concession that the ex-boyfriend had been at the house as

28  recently as February 24, 2005, were obtained through duress.

15

1    (<u>Id.</u> ¶ 23.)  Finally, in claim five, plaintiffs allege that

2    defendants actions were "intended to cause plaintiffs severe

3    emotional distress."  (<u>Id.</u> ¶ 151.)  Accordingly, given the

4    liberal pleading standards of Federal Rule of Civil Procedure

5    8(a), which govern state law claims in federal court, plaintiffs'

6    complaint qualifies at this stage for the social worker exception

7    to California's general grant of governmental immunity.  <u>Nathan</u>

8    <u>v. Boeing Co.</u>, 116 F.3d 422, 423 (9th Cir. 1997) (Federal Rules

9    of Civil Procedure govern state law claims over which courts have

10   supplemental jurisdiction); <u>New.Net, Inc. v. Lavasoft</u>, 356 F.

11   Supp. 2d 1090, 1099 (C.D. Cal. 2004) (same); <u>see also</u> Fed. R.

12   Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of

13   mind of a person may be averred generally.").

14           IT IS THEREFORE ORDERED that

15           (1) defendants' motion to dismiss claim three with

16   respect to defendants McDaniels and Torres for conduct related to

17   the instigation of dependency proceedings be, and the same hereby

18   is, GRANTED.

19           (2) pursuant to plaintiff's stipulation at oral

20   argument, defendants' motion to dismiss the action with respect

21   to defendant Indula be, and the same hereby is, GRANTED.

22           (3) with respect to all other defendants and/or claims,

23   defendants' motion to dismiss be, and the same hereby is, DENIED.

24   DATED:  April 25, 2006

25

26                       WILLIAM B. SHUBB

27                       UNITED STATES DISTRICT JUDGE

28